64

Knox Porcelain Corporation et al.

*v.*

Emily Madalyn S. Dockery et al.

442 S.W.2d 607.

(*Knoxville,* September Term, 1968.)

Opinion filed June 9, 1969.

H. H. McCampbell, Jr., Knoxville, for plaintiffs in error.

W. Conway Garlington and Wilson S. Ritchie, Knoxville, for defendants in error.

Mr. Chief Justice Burnett delivered the opinion of the Court.

This is a Workmen's Compensation case wherein the trial judge awarded the appellants (widow and dependent children) Workmen's Compensation benefits. The trial judge concluded, after setting forth the factual situation as he found it in this record, that:

"This Court is of the opinion deceased suffered from an occupation disease, that is dust which precipitated his original illness, causing him to see a doctor for help and that the diagnosis was uncertain without the thorocotomy and other procedure which became neces-

sary. From the stress caused by diagnostic procedures, the deceased employee developed ulcers necessitating additional surgical intervention. From this complications developed from which he consequently died."

The employer and insurance carrier make a very able argument, and in their brief they state their position thus:

"* * * if there was an occupational disease it had been established by diagnostic procedures undertaken prior to the surgery of the lung; that contrary to the assertion in the death certificate as established by the proof, the surgery was done in the belief that the employee suffered from cancer of the lung, in no wise associated with an occupational disease, and that even if the employee had an occupational disease, it was not the cause of death. Rather, it is their position that the surgery concerned a wholly unrelated matter and that it was the surgery that caused the death."

The case is indeed interesting and presents a rather unusual state of facts for a compensation case. We, in addition to reading and re-reading the briefs, and authorities therein cited, have spent a day or more making an independent investigation of the question. Counsel for the insurance carrier and employer concede very properly if there is any material evidence to support the finding of the trial judge that we are bound thereby. Of course, there are a legion of such cases in support of this. Even though this is conceded counsel in stating their position argue the facts as shown in this lawsuit, the weight to be given these facts, and the inferences to be drawn therefrom. We, of course, must look at these compensation cases from an entirely different standpoint.

By the enactment of the compensation law some fifty odd years ago our review is limited to the determination of the question of whether or not there is substantial evidence supporting the finding of the trial judge. This is particularly pointed out in *Atlas Power Co. v. Leister,* 197 Tenn. 491, 274 S.W.2d 364. Thus it is when we come to reviewing this record here we must see it from the employee's viewpoint, that is, we don't weigh the evidence of the doctor as to whether he is doubtful about this or that. If the doctor reaches a conclusion after this investigation that such a thing should be done we must accept that conclusion if the trial judge has accepted it. And such evidence is substantive or material.

One of the best works on Workmen's Compensation is Larson's, and in Vol. II of that work at sec. 80.32, page 322, this statement is made, which is particularly applicable to the medical testimony in the present record.

"It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand."

This might be true here when we take the statements of the medical witnesses herein and particularly those that the appellants argue are entitled to much force. We find though that there are other positive statements made herein which in our judgment make this case compensable and these statements are positive and the conclusions are drawn from an examination.

The trial judge had made a very clear and succinct statement of the facts as he saw and heard them from the witness stand, which is supported by this record, wherein he says:

"The deceased, Earl Wade Dockery had worked for eleven years at his place of employment with the defendant, until his last illness and death. He was a kiln operator at the porcelain plant of the defendant.

"On October 31, 1967 he became ill on the job and came home at 10:30 A.M. He was having difficulty breathing and was weak. His wife put him to bed and a few days later took him to a doctor, her doctor. He did not improve but got worse, so Mrs. Dockery took her husband to another doctor who X-Rayed him and he then went home where his condition continued to worsen. His wife then took him to see Dr. William K. Swann, who specializes in diseases of the chest and Thoracic Surgery and who saw the deceased for the first time on November 13, 1967.

"His medical history was taken, when deceased an employee of Knox Porcelain Corporation told the doctor he had been exposed to an atmosphere of dust at his place of employment for the past eleven years.

"Dr. Swann then examined Mr. Dockery and X-Ray revealed fibrosis in his lungs, and also suggested the possibility of mass lesions, (tumor). Also, the X-Rays showed the possibility of emphysematous changes. This was done in the doctor's office and thereafter deceased was admitted to the hospital.

"In the hospital other diagnostic procedures were carried out. The first procedure was a bronschoscopy with additional X-Rays. Also a brochography was done, diagnosis was *uncertain,* so on November 17, 1967 or four days later a thorocotomy, which is a surgical procedure in which deceased's chest was opened and blebs and bullae were removed along with a small segment

of his lung and nodes for the purpose of examination by a pathologist to determine his disease.

"With these procedures aforesaid, a diagnosis of emphysema was made, anthracosis, and traces of doubly re-fractial foreign material was found consistent with mild or minimal dust disease (meaning Silica particles.)

"The doctor was of the opinion the fibrosis of his lungs was likely due to the dust exposure at this place of work. It was not severe, but it was the reason he came to see the doctor. Further, that the dust disease develops to the point of fibrosis visible on the chest X-Ray, which is an abnormal situation and seen only in special occupations such as coal mining, zinc mining and sand blasting.

"Subsequent to the last dignostic procedure Mr. Dockery developed ulcers, which were caused by stress and those peptic ulcers commenced bleeding. This necessitated surgical intervention after which a tracheotomy was performed. Subsequent to that the incision re-opened and additional surgery was had. Mr. Dockery died on December 8, 1968 from continuous bleeding."

Then follows the conclusion of the trial judge as set forth in the early part of this opinion.

We find two or three pertinent things that the doctor said which support the finding of the trial judge, as follows. On completion of the procedures of examining this man the doctor on his deposition said:

"On the basis of all those findings we felt that his diagnosis was uncertain and that he should have an

exploratory operation, which we did on November 17, 1967.

"We did not find any tumor as we had suspected we might, but we confirmed the fact that he had fibrosis in his lungs, and that he had emphysematous blebs and bullae. Now, those things are cystic spaces, empty spaces that develop in the lungs from confluence of the small air sacs that break down and form big empty spaces. We resected those cysts and took biopsies of his lung tissue."

Then following his exploratory operation Mr. Dockery developed symptoms which caused a further examination and the doctor says this:

"Yes, he had multiple complications, the worst of which was massive bleeding from multiple gastric ulcers, and this required abdominal surgery. After the abdominal surgery, then he was unable to get rid of these secretions in his bronchial tree, and we had to do a tracheotomy to keep his chest cleaned out. He developed additional complications of the wound eviscera-tion, that is to say, his abdominal operation wound opened up and he had to be taken to the operating room and sutured again, and he subsequently died from continued bleeding, on December 8, 1967."

Dr. Swann was further questioned on his discovery deposition and among other things he said this:

"Q. Now, neither the lung condition or the surgery had anything to do with the fact that he had ulcers, did it?

"A. Yes, I think it sure did.

"Q. What is the connection?

"A. Sometimes when you subject a person to stress, and different people vary in how much stress they can take, sometimes in response to stress, people develop peptic ulcers, ulcers of the stomach and duodenal and even of the esophagus. When they do, these ulcers frequently bleed and may result in the patient's death. That is our interpretaion of what happened here.'

And the doctor also says this:

"It is a little bit more complicated than that. All I have to go on is the amount of fibrosis in his lung and that in itself is an assumption. I am assuming that the fibrosis that I see is due to dust exposure. I have no other explanation for it and, therefore, I say it is my opinion that the fibrosis in his lung was more than likely due to the dust exposure which he told me he had. He certainly did not have a severe degree of it, but apparently it was responsible for bringing him to see the doctor and his complaint of shortness of breath and that kind of thing."

When he man died, Dr. Swann, who was his principal physician, filed a medical certificate of cause of death thus:

"Death was caused by:

Immediate Cause (A)    *Bleeding Stress Ulcers of Stomach*

Due to         (B)   *Lung Surgery for*

Due to         (C)   *Occupational Dust Disease of Lungs.*"

■ We appreciate the weight that such a death certificate could have, and give it no more weight here than we

did in *Milstead v. Kaylor*, 186 Tenn. 642, 212 S.W.2d 610. When we take this death certificate along with this doctor's testimony and other things in this record, we readily see that there is material evidence, evidence of value, that was accepted by the trial court which clearly placed the cause of these things on an occupational disease covered by the act so as to make his death compensable.

The interesting question posed by this lawsuit is covered by Larson in his work on Compensation, particularly in Volume I, at sec. 13.21, wherein many cases in support of the text are annotated in the footnotes. The overwhelming number of these cases support an award for compensation wherein similar and related acts were done as were done here in this operation to stop this bleeding. The doctor says he performed the first operation for the purpose of diagnosis and this happened as a result of it which makes the case one for an award for compensation. We find that under the authorities there it is stated that the overwhelming majority of courts hold that this amounts to an aggravation of the primary injury by medical surgical treatment and is compensable.

The author of this work criticizes the cases that hold to the contrary and frankly says that by later development in Compensation law such holding is overruled. We find under this statement a case where, after a hernia operation, the employee suffered a heart attack, and it was held by a New Jersey Court in *Bisonic v. Halsey Packard, Inc.*, 62 N.J.Super. 365, 163 A.2d 194, that since the hernia operation was essential the resulting heart attack was held compensable. Then we find a Kentucky case of *McCorkle v. McCorkle*, 265 S.W.2d 779, where the surgeon's knife slipped during an operation for a herniated

disc and the employee bled to death. This was held compensable. Among the Tennessee cases annotated under the text here, is *E. I. DuPont De Nemours & Co. v. Kessler*, 208 Tenn. 224, 345 S.W.2d 663. This Court in that case held that the employee was not entitled to compensation for a permanently disabling heart condition since it was not caused by the exertions of employment but by progression of the pre-existing deterioration.

In the case of *Mallette v. Mercury Outboard Supply Co.*, 204 Tenn. 438, 321 S.W.2d 816, a man fell and received compensable injuries. When he was taken to the hospital and waited on by an orderly he was injured again in such a way that it caused paralysis which necessitated two operations, and this was held compensable. In the case of *Fennell v. Maryland Casualty Co.*, 208 Tenn., 116, 344 S.W.2d 352, the Court found that when the supply of drugs prescribed was exhausted the employee substituted whiskey and he developed as a result of that acute hepatitis in addition to malnutrition which caused his death. This Court found that this was causally related to the industrial back injury and compensation was awarded.

In other words the courts seem to hold in this kind of case that when there is a connection in the process of treatment or convalescence of a compensable injury or compensable disease, if the attempted treatment is within the compensable range of consequences, the employee is entitled to be compensated because the chain of causation is not broken.

Thus it is, after giving this matter thorough study and thought, we are satisfied that the trial judge is correct and his judgment is affirmed.